IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ONE ENERGY DEVELOPMENT, LLC, | ) | No. 36240-0-III |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| IRON HORSE SOLAR, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| KITTITAS COUNTY, a municipal | ) | |
| corporation; and KITTITAS COUNTY | ) | |
| BOARD OF COMMISSIONERS; and | ) | |
| WILLIAM HANSON, an individual; and | ) | |
| "SAVE OUR FARMS! SAY NO TO | ) | |
| IRON HORSE!"; and CRAIG CLERF and | ) | |
| PATRICIA CLERF, husband and wife, | ) | |
| | ) | |
| Respondents. | ) | |

PENNELL, A.C.J. — Under Kittitas County's zoning code, a solar farm project can be developed in certain agricultural areas if approved through a conditional use permit (CUP). The code lists several criteria for CUP approval, including, as relevant here, a condition that a project preserve "rural character" as that term is defined in the Growth Management Act (GMA), chapter 36.70A RCW. In the GMA, rural character refers to areas where open space, the natural landscape, and vegetation predominate over the built environment.

One Energy Development, LLC applied to Kittitas County for a CUP in hopes of constructing a large solar farm. A hearing officer initially recommended approval, but the Kittitas County Board of Commissioners (Commissioners) disagreed and voted against the CUP by a tally of 2-1. In making this decision, the Commissioners specified that the solar project was inconsistent with the GMA's definition of rural character because, on the parcels of land at issue in the CUP application, open space, the natural landscape, and vegetation would not predominate over the built environment.

The Commissioners' CUP analysis took too narrow a view of what it means for open space to predominate over the built environment. The GMA's rural character definition refers to patterns of development within the rural element of a county's comprehensive land use plan. It is not limited to a particular parcel or project site. Because the Commissioners' CUP denial was predicated on an erroneous legal determination, this matter must be remanded for further proceedings.

BACKGROUND

One Energy Development, LLC and Iron Horse Solar, LLC[1] sought to construct a solar photovoltaic project (Project) on farmland owned by William Hanson in Kittitas County, Washington. At the time it was proposed, the Project would have been the

---

[1] One Energy has sold its interests to Iron Horse, leaving Iron Horse the sole real party in interest to this appeal.

largest solar facility in Washington, covering 47.5 acres of a 67.8 acre, 4-parcel

property. The Project's proposed site was within Kittitas County's agriculture (A-20)

zone. Zone A-20 "is an area wherein farming, ranching and rural life styles are

dominant characteristics." KITTITAS COUNTY CODE (KCC) 17.29.010. The intent of the

A-20 zoning "classification is to preserve fertile farmland from encroachment by

nonagricultural land uses; and protect the rights and traditions of those engaged in

agriculture." *Id*. At the time of the Project's CUP application, such a solar project was

categorized as a major alternative energy facility and allowed in an A-20 zoning area

only as a conditional use. Former KCC 17.61.010(9) (2001), .KCC 17.61.020(4)(b).

Kittitas County sets forth the following criteria that must be met for approval of

a CUP:

1. The proposed use is essential or desirable to the public convenience and not detrimental or injurious to the public health, peace, or safety or to the character of the surrounding neighborhood.
2. The proposed use at the proposed location will not be unreasonably detrimental to the economic welfare of the county and that it will not create excessive public cost for facilities and services by finding that
   A. The proposed use will be adequately serviced by existing facilities such as highways, roads, police and fire protection, irrigation and drainage structures, refuse disposal, water and sewers, and schools; or
   B. The applicant shall provide such facilities; or
   C. The proposed use will be of sufficient economic benefit to offset additional public costs or economic detriment.

3

3. The proposed use complies with relevant development standards and criteria for approval set forth in this title or other applicable provisions of Kittitas County Code.
4. The proposed use will mitigate material impacts of the development, whether environmental or otherwise.
5. The proposed use will ensure compatibility with existing neighboring land uses.
6. The proposed use is consistent with the intent and character of the zoning district in which it is located.
7. For conditional uses outside of Urban Growth Areas, the proposed use:
   A. Is consistent with the intent, goals, policies, and objectives of the Kittitas County Comprehensive Plan, including the policies of Chapter 8, Rural and Resource Lands;
   B. *Preserves "rural character" as defined in the Growth Management Act (RCW 36.70A.030(15);*[2]
   C. Requires only rural government services; and
   D. Does not compromise the long term viability of designated resource lands.

KCC 17.60A.015 (emphasis added).

The GMA provision incorporated into Kittitas County's CUP standard (KCC 17.60A.015(7)(B) quoted above) defines "rural character" as a pattern of land use and development where, among other things, "open space, the natural landscape, and vegetation predominate over the built environment." RCW 36.70A.030(16)(a).

Iron Horse's CUP application went before a Kittitas County hearing examiner for an open record public hearing, pursuant to former KCC 15A.01.040(4)(d) (2014)

---

[2] The GMA's rural character definition is currently codified at RCW 36.70A.030(16).

and KCC 15A.02.060.[3] The hearing examiner admitted numerous exhibits into the

record, considered evidence, testimony and arguments presented by interested parties

regarding the SEPA determination and CUP application. Ultimately, the hearing

examiner issued a lengthy written decision, recommending[4] approval of the CUP.

The written decision included 44 recommended conditions of approval.[5]

The Commissioners took up the hearing officer's recommended findings

and conclusions through a closed record hearing process, pursuant to former

KCC 15A.01.040(3)(a) (2014). The Commissioners' hearings were held over two

days: December 20, 2016 and January 10, 2017.

During the December 20 hearing, Commissioner Obie O'Brien and Commissioner

Paul Jewell questioned the county's staff representative about environmental details of

the Project. Commissioner Laura Osiadacz then moved on to a "bigger topic" that caused

her the most concern. Clerk's Papers (CP) at 271. Commissioner Osiadacz questioned

---

[3] The hearing examiner also considered an appeal of a mitigated determination of nonsignificance under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. The SEPA appeal was denied and not pursued further.

[4] At the time of the hearings in this case, Kittitas County limited the hearing examiner's role to providing recommendations on the issuance of a CUP. Former KCC 15A.01.040(4)(d). Under the relevant code provision, the Commissioners were responsible for considering the hearing examiner's recommendations and making a final decision for the county. Former KCC 15A.01.040(3)(a) (2014).

[5] The recommended conditions of approval were in addition to the mitigation conditions included in the mitigated determination of nonsignificance.

whether the Project was consistent with preservation of rural character as defined in the

GMA. Pointing to the GMA's rural character definition recited above, Commissioner

Osiadacz expressed concern that the Project would not result in open space predominating

over the built environment since "62.5 percent of the property being use[d] for this

project is going to be built on." *Id.* Commissioner Osiadacz voiced concern that the

Project's large size would "take away from our agricultural lands and really take away

from the character of our community." *Id.* at 279. The matter was then continued to

January.

During the January 10, 2017 proceeding, Commissioner Osiadacz and

Commissioner O'Brien both focused on the issue of whether the Project was consistent

with rural character, as required for a CUP. Both commissioners stated that the rural

character requirement was not met, but they differed as to their reasoning. Commissioner

Osiadacz continued to express concern over the Project site and the fact that over one-half

of the property would be covered by development. Commissioner Osiadacz indicated

that if she were to take a broader view of what it meant for open space to predominate

over the built environment, her analysis of the CUP application would be different.[6]

---

[6] Specifically, Commissioner Osiadacz stated that if she were to consider the entirety of Mr. Hanson's property, 450 acres, instead of the 67.8 acres at issue, the development would be "under that 50 percent mark" and "there would be no way based on code that I could vote against this." CP at 342.

Commissioner O'Brien did take a broader view of what it meant for open space to predominate over the built environment. He explained that the rural character assessment should be made by looking to neighboring properties, not just a project site. Nevertheless, even with this broader view, Commissioner O'Brien explained that the Project was incompatible with the rural character of A-20 zoned land. Given the size of the Project, Commissioner O'Brien commented that the solar farm site would "stick[ ] out like a missing tooth in a smile." *Id*. at 336.

Commissioner Jewell agreed with Commissioner O'Brien that the rural character assessment goes to "the general landscape within the general area, not special to the individual parcel that's been considered for the project." *Id*. at 343. However, Commissioner Jewell disagreed with the disposition recommended by his fellow commissioners. Commissioner Jewell reasoned that because a major alternative energy facility, such as a solar farm, can be granted a CUP in an A-20 zone, the only question was whether the impact of such a facility on a surrounding rural community can be adequately mitigated. If impacts can be mitigated, rural character is maintained as a matter of law and the CUP must be granted.

After each commissioner clarified their disagreement over the rural character standard, Commissioner O'Brien moved to deny the CUP application. Commissioner Osiadacz seconded the motion. A discussion ensued, during which Commissioner

7

O'Brien explained that Iron Horse's Project was "not compatible with [existing farming] uses and with the neighborhood." *Id*. at 353. Commissioner Osiadacz stated she wished to deny the CUP based on her previous comments and what it means for the built environment to predominate over open space. Commissioner Jewell then voiced a dissenting opinion. He expressed concern over whether the Commissioners' decision would not be supportable through written findings. After calling for a formal vote, the CUP was denied, 2-1.

The Commissioners subsequently issued a five-page written decision in resolution form. For ease of reference, a copy of the decision, *id*. at 10-14, is appended to this opinion. The decision contains two sets of numbered paragraphs, the first numbered 1-12 and the second numbered 1-4. The first set of paragraphs are presented as findings of fact and conclusions of law, and consist of uncontroverted procedural facts leading up to the Commissioners' decision. The second set of numbered paragraphs addresses the contested issue of whether the CUP should be granted. Paragraph 1 cites to the GMA's rural character definition (former RCW 36.70A.030(15) (2005)), and states that, if the Project were approved "[o]pen space, the natural landscape, and vegetation **would not predominate** over the built environment on the subject parcels." *Id*. at 14. Paragraphs 2-3 of the second set of numbered paragraphs state, without

elaboration, that the proposed Project fails to comport with the requirements of

KCC 17.60A.015(1), KCC 17.60A.015(5), and KCC 17.60A.015(7)(B).

Iron Horse Solar subsequently sought review in Kittitas County Superior Court

under the Land Use Petition Act (LUPA), chapter 36.70C RCW.  The superior court

issued a memorandum decision denying relief.  Iron Horse now appeals to this court.

ANALYSIS

*Standard of review*

Local land use decisions are reviewed under LUPA.  RCW 36.70C.020(2).  When

assessing the merits of a LUPA appeal, we stand in the same position as the superior

court and review the administrative record.  *King County Dep't of Dev. & Envtl. Servs.*

*v. King County*, 177 Wn.2d 636, 643, 305 P.3d 240 (2013).  A party appealing a land

use decision bears the burden of meeting one of the six statutory standards for relief.

RCW 36.70C.130(1).  Iron Horse seeks relief under three of the applicable standards:

RCW 36.70C.130(1)(b) ("The land use decision is an erroneous interpretation of the law,

after allowing for such deference as is due the construction of a law by a local jurisdiction

with expertise."); RCW 36.70C.130(1)(c) ("The land use decision is not supported by

evidence that is substantial when viewed in light of the whole record before the court.");

and RCW 36.70C.130(1)(d) ("The land use decision is a clearly erroneous application of

the law to the facts.").

9

Under the standards cited by Iron Horse, questions of law are reviewed de novo and factual determinations are reviewed for substantial evidence. *Cingular Wireless LLC v. Thurston County*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). We defer to factual determinations made by the highest administrative body exercising fact-finding authority. *Id*. In this case, the Commissioners were the highest (and only) fact-finding authority. Former KCC 15A.01.040(3)(a). When it comes to review under RCW 36.70C.130(1)(d), a land use decision will be rejected as clearly erroneous if "we are left with a definite and firm conviction that a mistake has been committed." *Cingular Wireless*, 131 Wn. App. at 768.

*The legal question of the rural character definition*

Under the circumstances relevant to this case, Kittitas County's CUP provision requires an assessment of whether a proposed conditional use would be consistent with preservation of "rural character" as defined in the GMA.

The GMA defines "rural character" as:

[T]he patterns of land use and development established by a county in the rural element of its comprehensive plan:
    (a)   In which open space, the natural landscape, and vegetation predominate over the built environment;
    (b)   That foster traditional rural lifestyles, rural-based economies, and opportunities to both live and work in rural areas;
    (c)   That provide visual landscapes that are traditionally found in rural areas and communities;

      (d)   That are compatible with the use of the land by wildlife and for fish and wildlife habitat:

      (e)   That reduce the inappropriate conversion of undeveloped land into sprawling, low-density development;

      (f)   That generally do not require the extension of urban governmental services; and

      (g)   That are consistent with the protection of natural surface water flows and groundwater and surface water recharge and discharge areas.

RCW 36.70A.030(16).

Rules of statutory interpretation guide our analysis of the GMA's rural character definition.[7] The "fundamental objective" of statutory interpretation "is to ascertain and carry out the [l]egislature's intent." *Dep't of Ecology v. Campbell & Gwinn*, *LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). The primary resource for this endeavor is the language used by the legislature. But words must not be viewed in isolation. Instead, "meaning is discerned from all that the [l]egislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id*. at 11.

Viewing RCW 36.70A.030(16) in context, it is apparent that the question of whether open space will predominate over the built environment must be considered in the context of patterns of development within "the rural element" of the county's

---

[7] As previously stated, our review of legal issues is de novo. Because the GMA is a state statute, not a local ordinance, local expertise is not relevant to our interpretation. *City of Federal Way v. Town & Country Real Estate*, 161 Wn. App. 17, 37-38, 252 P.3d 382 (2011).

"comprehensive plan." This is a broad standard, and for good reason. The GMA

was written to address county-wide planning issues, not specific land use determinations.

*See Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 873, 947 P.2d

1208 (1997). The GMA affords counties the flexibility to include a variety of densities

within the rural element of their comprehensive plans. RCW 36.70A.070(5)(b). Given

this circumstance, the question of whether open space predominates over the built

environment cannot be viewed from a myopic perspective, specific to one piece of

property or a particular project. Although an individual land use decision can properly

take into account larger goals set by the GMA and a county's comprehensive plan,

*see Cingular Wireless*, 131 Wn. App. at 770-72, this individualized context does not

alter the meaning of the GMA's statutory terminology.

It bears emphasis that, under the Kittitas County Code, the GMA's rural

character assessment is only one of several general standards governing CUP approval.

In addition to preserving rural character as defined by the GMA, a CUP applicant

must also establish that a proposed project is "not detrimental or injurious . . . to the

character of the surrounding neighborhood" and "will ensure compatibility with

existing neighboring land uses." KCC 17.60A.015(1), (5). Such considerations are, by

definition, highly localized, though not necessarily confined to a particular project site.

Local considerations are important to ensuring that a zoning decision is compatible with

the goals of the GMA and a county's comprehensive plan. But they are not the same thing as the broader[8] GMA rural character inquiry.

*The Commissioners' decision*

In the discussions leading up to the CUP decision, the Commissioners debated the appropriate interpretation of the GMA's rural character definition. Commissioner Jewell and Commissioner O'Brien advanced an interpretation of rural character fairly consistent with our analysis. But Commissioner Osiadacz articulated a different, narrower view that is inconsistent with the interpretation set forth above. Because the adverse CUP decision turned solely on the votes of Commissioner O'Brien and Commissioner Osiadacz, the ultimate legality of the Commissioners' decision turns on whether it was premised on the narrow interpretation advanced by Commissioner Osciadacz.

---

[8] Not all components of the GMA's rural character definition are necessarily broader than the neighborhood considerations set forth at KCC 17.60A.015(1) and (5). The GMA's "predominate," or density, inquiry is only one of seven components of the rural character definition. RCW 36.70A.030(16)(a). Several of the components can involve highly localized considerations. For example, a small development could be functionally incompatible with a jurisdiction's rural character if it would impair fish and wildlife habitat. RCW 36.70A.030(16)(d). Or a relatively small structure could be visually incompatible with rural character if it marred the appearance of the rural landscape. RCW 36.70A.030(16)(c). When it comes to the functional and visual components of the rural character definition (as opposed to the density component), "rural character is perceived at relatively close quarters (e.g., within the view shed, 'just up the road,' or across the fence line)." *Vashon-Maury v. King County*, No. 95-3-0008, 1995 WL 903209 at *47, 1995 GMHB LEXIS 428 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Decision and Order Oct. 23, 1995).

Our review begins with the Commissioners' written decision. Because the Kittitas County Code requires the Commissioners' decision to include written findings, we scrutinize the findings under the same standard applicable to judicial findings. *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 35, 873 P.2d 498 (1994). This standard requires that written findings must go beyond the "[s]tatements of the positions of the parties and a summary of the evidence presented." *Id*. at 36. Instead, adequate findings must also illuminate the decision-maker's reasoning process. *Id*. Findings are not necessary as to every controverted fact, *In re Detention of LaBelle*, 107 Wn.2d 196, 218-19, 728 P.2d 138 (1986), but they must be "sufficiently specific to permit meaningful review." *Id*. at 218. In the land use context, findings should also be sufficiently detailed to provide guidance to a proposed developer. *Kenart & Assoc. v. Skagit County*, 37 Wn. App. 295, 303, 680 P.2d 439 (1984).

The only portion of the Commissioners' decision addressing the controverted issue of whether to issue a CUP is the second set of numbered paragraphs. Paragraphs 2-4 of this set of paragraphs are nothing more than legal conclusions, specifying that the Project failed to meet the requirements of KCC 17.60A.015(1), (5), and (7)(B). As such, they cannot be fairly characterized as findings. The only portion of the Commissioners' decision that can be interpreted as a finding of a controverted fact is the first paragraph.

14

It states:

1. Open space, the natural landscape, and vegetation **would not predominate** over the built environment on the subject parcels if the proposal were approved in this location **(RCW 36.70A.030(15))**.

CP at 14.

This finding reflects Commissioner Osiadacz's view that rural character must be judged according to the parcels of land at issue in a CUP application. As previously stated, this assessment is too narrow. Because the sole finding in support of the Commissioners' legal conclusions reflects a misinterpretation of the governing law, the written decision is not sufficient to withstand appellate scrutiny.

In apparent recognition of the deficiencies with the Commissioners' written decision, the county urges us to supplement the written decision with oral "statements in the record." *Labelle*, 107 Wn.2d at 219. If statements from Commissioner O'Brien and Commissioner Osiadacz indicated that reasons other than the density of the Project site prompted the vote against the CUP, then the county's position might have weight. After all, as documented by the superior court, there are numerous facts in the record that could support denial of the CUP based on KCC 17.60A.015(1), (5), and (7)(B).

The county's suggested approach is ultimately unhelpful because the Commissioners' oral comments underscore the concern raised by the written decision. Commissioner Osiadacz went out of her way to make clear that her vote against the CUP

turned on the fact that over one-half of the Project site would be covered by development instead of open space. Commissioner Osiadacz also made plain that if she had taken a broader geographic view of what it meant for open space to "predominate" over the built environment, her vote would be different.

Commissioner Osiadacz's transparency as to the reasons for her CUP decision deserves great credit. Commissioner Osiadacz knew she held a minority perspective of how to view the GMA's rural character definition. She also knew she held the deciding vote on Iron Horse's CUP application. By candidly clarifying the fact that her vote on the CUP application turned on her assessment of the rural character definition, Commissioner Osiadacz ensured Iron Horse would receive meaningful consideration on appeal, should her assessment turn out to be incorrect. That is what happened and it is the way our justice system should work. Because Commissioner Osiadacz's assessment of the rural character definition turned out to be inconsistent with our interpretation, the current CUP decision cannot stand.

*Applicable remedy*

Appellate remedies for an adverse land use decision include reversal or remand for modification or further proceedings. RCW 36.70C.140. Iron Horse requests we reverse the Commissioners' decision and remand with instructions to adopt the findings and conclusions proposed by the Kittitas County hearing examiner. This position lacks legal

16

support.  The hearing examiner never made any legal findings.  Pursuant to the terms

of the applicable county code, former KCC 15A.01.040(4)(d), the hearing examiner

merely made "recommendations" that the Commissioners were free to adopt or reject.

*See Marantha Mining v. Pierce County*, 59 Wn. App. 795, 800-01, 801 P.2d 985 (1990).

Although we will sometimes reverse an adverse land use decision with instructions to

grant specific relief, doing so is an extreme remedy.  We will only direct specific relief

when it is apparent that remand for further proceedings would be "pointless."  *Id*. at 805.

Here, we have no reason to believe remand would be pointless.  The legal error

giving rise to this decision was prompted by a good-faith dispute over the meaning of

a technical statutory term.  There was no misconduct or bad faith.  As set forth by the

competing analyses provided by the hearing examiner and the superior court, the facts

in the record could have supported either approval or denial of the CUP.  The appropriate

remedy is therefore to remand for further proceedings without instructions as to a

particular disposition.

CONCLUSION

This matter is remanded for reconsideration of Iron Horse's CUP application,

pursuant to the rural character definition set forth in this opinion.  The Commissioners'

decision on reconsideration shall include written findings of fact that are sufficiently

detailed to permit meaningful review by Iron Horse and by the judiciary, should there be any further appellate review.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____ Pennell, A.C.J.

I CONCUR:

_____ Siddoway, J.

# APPENDIX

**BOARD OF COUNTY COMMISSIONERS
COUNTY OF KITTITAS
STATE OF WASHINGTON**

**CONDITIONAL USE PERMIT
DENIAL**

**IRON HORSE SOLAR FARM CONDITIONAL USE PERMIT (CU-15-00006)**

<u>**RESOLUTION**</u>

<u>**NO. 2017- O22**</u>

**WHEREAS,** according to Kittitas County Code Title 15A, relating to Hearings and Title 17.60A Conditional Uses, an open record hearing was held by the Kittitas County Hearing Examiner on October 20, 2016, for the purpose of considering a conditional use permit known as Iron Horse Solar Farm CU-15-00006 and described as follows:

> The construction and operation of a 47.5acre photovoltaic solar power generation facility on approximately 68 acres in the Agriculture 20 zone. The subject property is accessed off Caribou Road and located approximately 1 mile east of the City of Kittitas at 320 South Caribou Road, in a portion of Section 01, T17N, R19E, WM in Kittitas County, bearing Assessor's map numbers17-19-01000-0023, 17-19-01000-0028, 17-19-01000-0042, and 17-19-01000-0043. Proponent: OneEnergy Development LLC authorized agent for Bill Hanson, landowner.

**WHEREAS,** public testimony was heard, in favor of and against the proposal; and,

**WHEREAS,** due notice of the hearing had been given as required by law, and the necessary inquiry has been made into the public interest to be served by such use; and,

**WHEREAS,** the Hearing Examiner recommended approval of said proposed conditional use; and,

**WHEREAS,** a closed record public hearing was held by the Board of County Commissioners on December 20, 2016 and January 10, 2016 to consider the Hearing Examiner's recommendation on this matter; and,

**WHEREAS,** the Kittitas County Board of Commissioners make the following FINDINGS OF FACT and CONCLUSIONS AT LAW concerning said proposed conditional use:

1. OneEnergy Development LLC authorized agent for Bill Hanson, landowner, submitted a conditional use application for a Major Alternative Energy Facility on approximately 68 acres.

20

The subject property is zoned Agriculture 20. This "Utility" (KCC 17.61.010{1}) is subcategorized as a major alternative energy facility (KCC 17.61.010{9}), and as such requires approval of a conditional use for the zone 17.61.020(4)(b).

2. This proposal is located approximately 1 mile east of the City of Kittitas at 320 South Caribou Road, in a portion of Section 01, T17N, R19E, WM in Kittitas County, bearing Assessor's map numbers17-19-01000-0023, 17-19-01000-0028, 17-19-01000-0042, and 17-19-01000-0043. Access as proposed is provided for via an existing permit with Kittitas County.

3. The Kittitas County Comprehensive Plan's Land Use Element designates the subject property as Rural Working and the zoning for this proposal is Agriculture 20.

4. Kittitas County Code provides under Chapter17.60A.015 provides review criteria for conditional use permits which states that:

The Director or Board, upon receiving a properly filed application or petition, may permit and authorize a conditional use when the following requirements have been met:

1) The proposed use is essential or desirable to the public convenience and not detrimental or injurious to the public health, peace, or safety or to the character of the surrounding neighborhood.

2) The proposed use at the proposed location will not be unreasonably detrimental to the economic welfare of the county and that it will not create excessive public cost for facilities and services by finding that

   a) The proposed use will be adequately serviced by existing facilities such as highways, roads, police and fire protection, irrigation and drainage structures, refuse disposal, water and sewers, and schools; or

   b) The applicant shall provide such facilities; or

   c) The proposed use will be of sufficient economic benefit to offset additional public costs or economic detriment.

3) The proposed use complies with relevant development standards and criteria for approval set forth in this title or other applicable provisions of Kittitas County Code.

4) The proposed use will mitigate material impacts of the development, whether environmental or otherwise.

5) The proposed use will ensure compatibility with existing neighboring land uses.

6) The proposed use is consistent with the intent and character of the zoning district in which it is located.

7) For conditional uses outside of Urban Growth Areas, the proposed use:

   a) Is consistent with the intent, goals, policies, and objectives of the Kittitas County Comprehensive Plan, including the policies of Chapter 8, Rural and Resource Lands;

21

b) Preserves "rural character" as defined in the Growth Management Act (RCW 36.70A.030(15));
c) Requires only rural government services; and
d) Does not compromise the long term viability of designated resource lands.

5. The Washington State Growth Management Act mandates the county to develop a comprehensive plan, and that within that plan a Rural Element be devised which "include measures that apply to rural development and protect the rural character of the area as established by the County." These measures must be used to control rural development, assure visual compatibility of rural development with surrounding areas, reduce sprawl and protect against conflict with the use of agricultural, forest and mineral resource lands (RCW 36.70A.070). "Rural Character" is defined in the Act thus:

"Rural character" refers to the patterns of land use and development established by a county in the rural element of its comprehensive plan:

(a) In which open space, the natural landscape, and vegetation predominate over the built environment;

(b) That foster traditional rural lifestyles, rural-based economies, and opportunities to both live and work in rural areas;

(c) That provide visual landscapes that are traditionally found in rural areas and communities;

(d) That are compatible with the use of the land by wildlife and for fish and wildlife habitat;

(e) That reduce the inappropriate conversion of undeveloped land into sprawling, low-density development;

(f) That generally do not require the extension of urban governmental services; and

(g) That are consistent with the protection of natural surface water flows and groundwater and surface water recharge and discharge areas.

6. The conditional use permit application was submitted to Community Development Services (CDS) on November 12th, 2015. On December 17th, 2015 the application was deemed incomplete following a mandated pre-application meeting between county staff and representatives of the applicant. Materials required at that time included a transportation concurrency application. On March 3rd, 2016 revised project materials were submitted by the applicant who included the required information as well as an updated narrative and SEPA checklist. The application was deemed complete on May 12th, 2016. The Notice of Application for the conditional use permit was issued on May 23rd, 2016. This notice was published in the official county paper of record and was mailed to jurisdictional government agencies, adjacent property owners and other interested parties. The last day to submit written comments with regard to the proposal

was on June 7th, 2016.

7. Kittitas County acted as the lead agency for the SEPA Environmental Checklist and threshold determination. As per WAC 197-11-355 and KCC 15A.04.010 the county utilized the optional DNS process. Notice was given that the County was expecting to issue a Determination of Non-Significance, and that the notice of application comment period (14 days) may be the only opportunity to provide comment on the environmental impacts of the proposal.

8. The SEPA checklist was reviewed by staff in conjunction with the project narrative. On June 27th, 2016 the application was placed on hold by the applicant and review was temporarily suspended. On July 15th, 2016 the applicant requested that review continue and submitted supplemental documentation with respect to comments received.

9. After a detailed review of the SEPA checklist, the project narrative, supplemental submission, and proposed mitigation measures the SEPA official determined that there would be no significant adverse environmental impacts under the provisions of WAC 197-11-350. A Mitigated Determination of Non-Significance (MDNS) was issued for this project on August 10th, 2016.

10. The appeal period for the SEPA determination ended on August 24th, 2016 at 5:00 p.m. A timely appeal was filed with the BOCC on August 24th, 2016 by "Save Our Farms! Say No to Iron Horse". The appeal was heard before the Kittitas County Hearing Examiner on Thursday October 20th, 2016. The Hearing Examiner issued a decision on November 8th, 2016 which, based on listed findings, held *that* "...the August 10, 2016 SEPA determination by the responsible official in the above referenced matter is affirmed in every respect".

11. The Hearing Examiner open record public hearing for the SEPA appeal and the Conditional Use Permit was held on October 20th, 2016. Representatives of the applicant presented materials and testified at the hearing. Members of the public testified. On November 9th, 2016, the Kittitas County Hearing Examiner returned a recommendation that the Iron Horse Solar Farm Conditional Use Permit (CU-15-00006) be approved with the staff recommended conditions plus an additional two conditions.

12. The Board of County Commissioners conducted a closed record meeting on December 20th, 2016 and continued the meeting to January 10th, 2017 for the purpose of considering the Iron Solar Farm Conditional Permit (CU-15-00006). A motion was made and seconded that the conditional use permit be denied; the motion carried on a vote of 2-1 with the following conclusions:

**NOW THEREFORE, BE IT HEREBY RESOLVED** that the Kittitas County Board of Commissioners hereby deny the approval of the <u>**Iron Horse Solar Farm Conditional Use Permit (CU-15-00006)**</u> and adopt the above Findings of Fact, and Conclusions of Law.

1. Open space, the natural landscape, and vegetation **would not predominate** over the built environment on the subject parcels if the proposal were approved in this location **(RCW 36.70A.030(15))**.

2. The proposed use in the proposed location **is not** essential or desirable to the public convenience and is detrimental or injurious to the public health, peace, or safety, or to the character of the surrounding neighborhood **(KCC 17.60A.015(1))**

3. The proposed use in the proposed location **would not** ensure compatibility with existing neighboring land uses **(KCC 17.60A.015(5))**.

4. The Proposed use in the proposed location **does not** preserve the "rural character" as defined in the Growth Management Act (RCW 36.70A.030(15)) **(KCC 17.60A.015(7)(B))**.

DATED this _____ day of _____, 2017 at Ellensburg, Washington.

BOARD OF COUNTY COMMISSIONERS
KITTITAS COUNTY, WASHINGTON
**OPPOSED**

Paul Jewell, Chairman

Laura Osiadacz, Vice Chairman

Obie O'Brien, Commissioner

ATTEST:
CLERK OF THE BOARD

Julie A Kjorsvik

APPROVED AS TO FORM:

Greg Zempel WSBA #19125

24

No. 36240-0-III

FEARING, J. (dissenting) — Ample facts support the findings and conclusions of the Kittitas County Board of Commissioners regardless of on what theory a commissioner relied in denying the application of a conditional use permit. Therefore, I would affirm the trial court's denial of Iron Horse Solar's LUPA petition. The trial court penned a thorough and thoughtful decision when denying the petition, and I adopt that decision as my dissent. Attached is a copy of the trial court's decision.

I DISSENT:

_____
Fearing, J.



**IN THE SUPERIOR COURT OF WASHINGTON**
**KITTITAS COUNTY**

| | |
|---|---|
| ONE ENERGY DEVELOPMENT LLC; and IRON HORSE SOLAR LLC , | Cause No. 17-2-00075-5 |
| Plaintiffs, | |
| vs. | MEMORANDUM DECISION |
| KITTITAS COUNTY, a municipal corporation; and KITTITAS COUNTY BOARD OF COMMISSIONERS; and "SAVE OUR FARMS! SAY NO TO IRON HORSE!; and CRAIG CLERF AND PATRICIA CLERF, husband and wife | |
| Defendants. | |

## INTRODUCTION

Oral argument on Petitioner's Land Use Petition Act (LUPA) appeal occurred on September 7, 2017. Timothy McMahon appeared for the plaintiffs. Kenneth Harper appeared for the Defendant Kittitas County and the Kittitas County Board of Commissioners. James Carmody appeared for Defendants Save our Farms and Craig and Patricia Clerf. After hearing all arguments, the Court took the matter under advisement in order to review the record and the pleadings submitted by all parties. The Court has reviewed the voluminous hearing records, state statutes, county code provisions, court cases, and all arguments presented.

1

## DISCUSSION

1. **Factual Background** At issue is the granting or denial of a Conditional Use Permit for property owned by William Hanson, located east of the town of Kittitas on four flat parcels of land in the center of the Kittitas Valley, in the midst of farmland. Currently the land is used for farming a rotation of crops, including timothy hay and alfalfa. The soil is productive and the adjacent and nearby neighbors are also engaged in farming. The property owner proposed to lease his property to One Energy Development LLC and to convert the farmland into a 47.5 acre solar PV facility in an area which is zoned there and all around it as Agriculture 20 (A-20). The project is named the Iron Horse Solar LLC project. The land use designation for the property and the surrounding properties is Rural Working Land.

The Kittitas County Code provides that a solar farm--which is designated by the County code in KCC 17.61.010(9) as a "major alternative energy facility"—is allowed in the A-20 zoning area only as a conditional use. KCC 17.61.020(4)(b).[1] Thus, in order to operate in this A-20 area, this solar PV facility must first

_____

[1] The term Solar Farm is used both in the Kittitas County Code and in the application for conditional use permit. However, the facility involved is not a farm. It is a facility that is non-agricultural and industrial in nature.

2

01338

be granted a conditional use permit for this particular property by the Kittitas County Board of Commissioners.

During the ongoing application process for approval of the facility, One Energy had to also abide by the Kittitas County SEPA process as well. The SEPA review and the project permit review were consolidated into one procedure, pursuant to KCC 15A.01.010. The SEPA issues went before a Hearing Examiner, who conducted an open record adjudicative hearing on October 20, 2016. Public comment and testimony and submission of evidence were taken at this hearing. The Hearing Examiner's job was both to decide the merits of the administrative appeal of the State Environmental Policy Act threshold determination and issuance of the Mitigated Determination of Nonsignificance (MDNS), and to make a recommendation to the Board of County Commissioners about the issuance of the conditional use permit (CUP).

The Hearing Examiner did do this. It denied the SEPA appeal, affirming the MDNS, and it also recommended that the BOCC approve the CUP application with conditions. The proposal had engendered considerable public interest, particularly among adjacent and other nearby landowners, and they participated as allowed by providing letters, testimony, and various documents for consideration.

After the decision and recommendation of the Hearing

3

Examiner, the Board of County Commissioners held a closed record hearing pursuant to KCC 15A.01.040(3)(a) to make a decision as to the granting of the conditional use permit. The closed record hearing meant that the commissioners were given the full administrative record available to the Hearing Examiner, and were able to discuss their questions and opinions about the various issues presented, to deliberate, and eventually to issue a written decision in the form of Resolution 2017-022, dated February 7, 2017. The Commissioners, by a vote of two to one, denied the Iron Horse project conditional use permit application.

In Resolution 2017-022, the commissioners listed the following substantive statements:

"1. Open space, the natural landscape, and vegetation would not predominate over the built environment on the subject parcels if the proposal were approved in this location. (RCW 36.70A.030(15)

2. The proposed use in the proposed location is not essential or desirable to the public convenience and is detrimental or injurious to the public health, peace, or safety, or to the character of the surrounding neighborhood. (KCC 17.60A.015(1))

3. The proposed use in the proposed location would not ensure compatibility with existing neighboring land uses. (KCC

4

17.60A.015(5).

4. The proposed use in the proposed location does not preserve the "rural character" as defined in the Growth Management Act. (RCW 36.70A.030(15)) KCC 17.60A.015(7)(B)).

This appeal timely followed on February 23, 2017 with the filing of the Land Use Petition.

2. **Standard of Review:** The Land Use Petition Act, LUPA, provides the exclusive means for judicial review of a land use decision (with some exceptions). *Woods v. Kittitas County*, 162 Wn. 2d 597 (2007)

RCW 36.70C.130 sets forth the standards for granting relief in a LUPA appeal. The court may grant relief only if the party seeking relief has carried the burden of establishing that one of the six standards set forth in RCW 36.70C.130(1) has been met. The standards are as follows:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of the law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record

5

01341

before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1).

One Energy, in its brief, argues that it can establish five out of the six standards, (a) through (e). The court will discuss each in this decision.

Deference must be given to the decisions and factual determinations of the local decision making authority. In this case, the BOCC enacted in KCC 15A.01.040 (4)(d) a model in which the Hearing Examiner shall make only recommendations to the BOCC regarding the granting of conditional use permits. Decision making authority over the granting of conditional use permits is retained by the BOCC in the code. This reviewing court, thus, must give substantial deference to the decisions of the BOCC, not to the Hearing Examiner, which makes findings and decisions regarding SEPA, but not the decision regarding conditional use permits. Evidence, and all logical inferences from that evidence, are viewed in the light most favorable to the party that prevailed in front of the BOCC—in this case the defendants.

Plaintiff did not cite persuasive authority which would support giving that deference to the Hearing Examiner because of

6

a perceived or real deficiency in the Findings of Fact found by the legal decision maker, and this Court declines to find that the Hearing Examiner was the highest fact finder in this case.

For the reasons set forth below, this Court finds that the plaintiff has not established any of the standards necessary to overrule the determination of the Board of County Commissioners.

## 3. **Analysis:**

Analysis of plaintiff's Statement of Issues is organized around specific LUPA standards of review.

**I. THIS LAND USE DECISION WAS NOT OUTSIDE THE AUTHORITY OR THE JURISDICTION OF THE KITTITAS COUNTY BOARD OF COMMISSIONERS UNDER RCW 36.70C.130(1)(e).**

One Energy argues as part of standard (1)(e) that the BOCC acted outside of its authority by disregarding the Hearing Examiner's findings. This Court disagrees.

The Board's role in the conditional use permit process is to determine whether the applicant has met the requirements of the conditional use using KCC 17.60A.015 Review criteria. The Hearing examiner did not have the authority to permit and

7

01343

authorize a conditional use.

The plaintiffs have not carried a burden of proving that the land use decision was outside the authority or jurisdiction of the body making the decision: in this case, the Kittitas County Board of County Commissioners. As both petitioner and defendant indicate, the SEPA review and the CUP review were consolidated into one hearing, so that the public and the parties and all interested persons could present testimony or submit evidence at one time for consideration of the various land use decisions by the various land use decision makers.

Nevertheless, as noted earlier, the Kittitas County Board of Commissioners retained decision making authority with regard to the granting or denial of Conditional use permits in KCC 15A.01.040 (4)(d). The code provisions regarding this procedure are set out in the relevant parts of KCC 15A.01.040:

"3. **Board of County Commissioners**. In addition to its legislative responsibilities under KCC Title 15B, the board shall review and act on the following subjects pursuant to this title:

a. Recommendations of the Hearing Examiner or Planning Commission. Decision-making process by the board shall consist of a public meeting or meetings wherein the board reviews the written record transmitted from the Hearing Examiner for Quasi judicial matters and the Planning Commission for Legislative matters and issues a written decision in resolution or ordinance form. During such meeting(s), appropriate county staff will present the record to the board, providing information as necessary to ensure county code compliance. No new comment or information will be allowed by the board during the decision-making process.

b. Appeals of administrative SEPA actions regarding an action without an underlying permit.

8

01344

c. Open record appeal of administrative SEPA actions when the board of county commissioners hears the appeal of the associated administrative permit decision.

d. Appeal of administrative determinations such as short plats, variances, and code interpretations.

e. Shoreline substantial development permits that are included in consolidated permit applications that are subject to Board review and action.

f. Review and provide initial local County approval, denial, or approval with conditions for shoreline conditional use permits and shoreline variances that are in consolidated permits applications that are subject to Board review and action.

**4. Hearing Examiner - Recommendation.** The Hearing Examiner shall review and make recommendations to the board of county commissioners on the following applications and subjects:

a. All Quasi judicial review processes including:

    i. applications for preliminary plats

    ii. Rezone applications.

b. Other actions requested or remanded by the board of county commissioners.

c. Development agreements.

d. Conditional use permits pursuant to the zoning code, KCC Title 17

e. In the case of an open record appeal of administrative SEPA actions when the Hearing Examiner makes a recommendation to the board of county commissioners on the underlying permit, the Hearing Examiner shall decide the SEPA appeal.

Integration of the hearings by statute, for purposes of taking evidence, does not equate to mandating the rubber stamping of the Hearing Examiner's recommendation. This court has found no case law requiring the BOCC to "engage with the findings and conclusions produced by the Hearing Examiner," or to "refute,

9

01345

challenge, or reply to" the explanations of the Hearing Examiner.

Moreover, the decision facing the Hearing Examiner regarding the SEPA appeal involved a different decision with different considerations than the decision facing the Commissioners. As defendants point out, the SEPA review of the MDNS is a threshold determination and does not bind any decision maker on a challenge to the conditional use permit.

The Commissioners were the only decision makers who did have authority or jurisdiction to make this land use decision. Standard (1)(e) has not been met.

## II. THE BOARD OF COUNTY COMMISSIONERS DID NOT FAIL TO FOLLOW THEIR PRESCRIBED PROCESS IN MAKING THEIR LAND USE DETERMINATION UNDER RCW 36.70C.130(1)(a).

The actual procedure that was followed involved an open public hearing, the submission of testimony and evidence, and the following consideration of all of the record of the open hearing at the commissioner's closed hearing. This procedure tracked the requirements set out in the code provision above. The plaintiff has not identified any procedural errors in the process undertaken in this case up to the point of the issuance of the Resolution 2017-022.

One Energy argues that the Findings of Fact in the Resolution are substantively insufficient, to the extent that

10

01346

there were essentially **no findings** of any substantive fact, which they then argue is a failure to follow KCC 15A.06.020, and thus a violation of Standard (1)(a). They argue that this failure to make findings means that deference must be given to the Hearing Examiner, which was the highest previous entity that made specific findings, so that the Hearing Examiner became the highest level finder of fact.

The defendant from Save our Farms counters that a finding of facts is indeed set forth in Resolution 1017-022, that the findings, even if conclusory, are sufficient as a matter of law to show the bases upon which the commissioners made their decision. The defendant adds that they were supported by substantial evidence (which will be taken up in another argument).

The defendant Kittitas County likewise argues that even if findings lack specificity or are conclusory, appellate review may proceed where the record of the oral decision enables the appellate court to review the decision making process. It argues that in this case, the oral record was extensive and clear as to the final factors upon which the commissioners based their decision. They also apparently argue that the actual criteria for conditional use permit review involve subjective general criteria which would not be conducive to empirical facts and thus are admittedly not so detailed as the hearing examiner's facts, though they are at least legally sufficient. While it is true

11

that the criteria are by nature general and to an extent, subjective, the court believes more specific findings are possible, desirable, and preferable in such a situation.

However, although the court notes deficiencies in the findings, this court disagrees with the plaintiff and ultimately agrees with the defendant that the findings made were legally sufficient.

The findings are embodied in Resolution 2017-022. As plaintiff points out, the bulk of the facts are procedural facts and recitations of the laws/code provisions/definitions which the Commissioners had to consider. The last four statements of the resolution, quoted above, which are characterized by the plaintiff as conclusions of law, are in reality both findings and conclusions. They are the only substantive factual statements listed, and constitute the ultimate reasons that the County commissioners gave to explain their denial of the conditional use permit.

This Court finds these are marginally sufficient as findings of fact. They lack detail and any citation to the record itself. However, broad as they are, they are sufficiently specific to permit the Court to review the record and understand the decision. The oral record of the Commissioners' deliberations and decision was extensive, and the voluminous record as a whole

12

01348

does allow this Court to review the decision for sufficiency of evidence. A common sense reading of "findings" requirements here should prevail. Although the Court was tempted to remand the case to the Board of Commissioners to set out facts with greater specificity, the Court is able to understand the reasoning of the commissioners without so requiring. Thus it would be a pointless gesture to send the matter back for improved findings, and the Court is not inclined to engage in a pointless gesture.

Therefore, plaintiffs have not shown that the Commissioners failed to follow the prescribed process as in Standard (1)(a).

**III.  The Resolution 2017-022 is not an erroneous interpretation of law under RCW 36.70C.130 (1)(b).**

The Board found in Finding Number 4, that "the proposed use in the proposed location does not preserve the rural character as defined in the Growth Management Act, RCW 36.70A.030(15) and KCC 17.60A.015 (7)(B)." Resolution 2017-022. The definition for rural character referenced in the County Code from the RCW is:

> "(16) "Rural character" refers to the patterns of land use and development established by a county in the rural element of its comprehensive plan:
> (a) In which open space, the natural landscape, and vegetation predominate over the built environment;
> (b) That foster traditional rural lifestyles, rural-based economies, and opportunities to both live and work in rural areas;
> (c) That provide visual landscapes that are traditionally found in rural areas and communities;

13

01349

(d) That are compatible with the use of the land by wildlife and for fish and wildlife habitat;

(e) That reduce the inappropriate conversion of undeveloped land into sprawling, low-density development;

(f) That generally do not require the extension of urban governmental services; and

(g) That are consistent with the protection of natural surface water flows and groundwater and surface water recharge and discharge areas." RCW 36.70A.030(16).

This standard must be reviewed after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise. In this case, the Board is the local decision maker and the Board is also the source of the ordinance that sets out the permit criteria, referencing this RCW. The Board is the governing legislative body in a largely rural county, which has considerable experience in discussing and determining rural character. And the Board is singly tasked with deciding the issuance of Conditional Use Permits, and thus must deal with these standards and definitions on a regular basis. Some deference is due to the Kittitas County Commissioners on this issue. But even if deference was not due, the Court finds that the Board did not misinterpret the law.

Plaintiffs contend that the commissioners misapplied the "rural character" provision of the Kittitas County Code provision. They cite to the fact that two solar farms have already been approved, and neither was appealed with respect to conformance with the rural element of the comprehensive plan. The argument appears to be that the very inclusion of solar farms

14

01350

as a conditional use in the A-20 zone declares that solar facilities are consistent with rural character.

However, conditional uses are not the same as permitted uses. Conditional uses are uses that would not be allowed in specific zones unless the proponent applicant of the particular use can demonstrate to the satisfaction of the finder of fact that there is compliance with each of the conditional use permit criteria at that particular site. Solar farms are only allowed in A-20 as a conditional use. Therefore, each individual solar farm must meet every one of the criteria for a conditional use in a site specific review and evaluation before it can be granted a conditional use permit. Preserving rural character is one of the conditions that must be met, and the burden of showing that it does so at this specific site rests with the applicant proponent of the solar farm.

There is nothing inconsistent about a finding that major alternative energy facilities may but also may not preserve rural character as it applies to a specific project in a specific place, even in the same zoning. One component of rural character refers to "patterns of land use and development established by a county in the rural element of its comprehensive plan: (a) in which open space, the natural landscape, and vegetation predominate over the built environment." There could be an almost infinite number of configurations of project and siting that could yield vastly different results from each other.

15

01351

Additionally, since compliance with the Comprehensive Plan is made part of the local conditions which must be met for a conditional use permit, the applicant is mandated to show compliance with the Comprehensive Plan. *Cingular Wireless, LLC,* 131 Wn. App. 756 (2006). This court finds it is not error for the Commissioners to consider rural character as it is discussed in the comprehensive plan during the site specific analysis. The definition in the Growth Management Act at RCW 36.70A.030 is:

> "Rural character" refers to the patterns of land use and development established by a county in the rural element of its comprehensive plan:
> (a) In which open space, the natural landscape, and vegetation predominate over the built environment;
> (b) That foster traditional rural lifestyles, rural-based economies, and opportunities to both live and work in rural areas;
> (c) That provide visual landscapes that are traditionally found in rural areas and communities;
> (d) That are compatible with the use of the land by wildlife and for fish and wildlife habitat;
> (e) That reduce the inappropriate conversion of undeveloped land into sprawling, low-density development;
> (f) That generally do not require the extension of urban governmental services; and
> (g) That are consistent with the protection of natural surface water flows and groundwater and surface water recharge and discharge areas

It is not an erroneous interpretation of law, specifically rural character, to consider whether a massive industrial project of this nature, encompassing 47.5 acres, eight feet high with large mechanized racks to follow the sun, set in the middle of treeless productive farm fields preserves rural character, interferes with visual compatibility of the surrounding area, or contains a built

16

01352

environment which predominates over the natural landscape.

Plaintiffs point out that this facility of 47.5 acres is but a small percentage of agricultural land in Kittitas County. The court finds that this is true and would be relevant to an issue of whether overall agriculture production in the valley is threatened by the project. However, in discussing rural character, the relevant criteria for the Commissioners in KCC 17.60A.015 were:

> 1. "The proposed use is essential or desirable to the public convenience and not detrimental or injurious to the public health, peace, or safety or to the character of the surrounding neighborhood. …
>
> 5. The proposed use will ensure compatibility with existing neighboring land uses.
>
> 6. The proposed use is consistent with the intent and character of the zoning district in which it is located.
>
> 7. For conditional uses outside of Urban Growth Areas, the proposed use:
>
> A. Is consistent with the intent, goals, policies, and objectives of the Kittitas County Comprehensive Plan, including the policies of Chapter 8, Rural and Resource Lands;
>
> B. Preserves "rural character" as defined in the Growth Management Act (RCW 36.70A.030(15));
>
> C. Requires only rural government services; and
>
> D. Does not compromise the long term viability of designated resource lands. "

The relevant inquiry is the effect on the character of the "surrounding neighborhood" and not necessarily the entire county. The plaintiffs' suggestion that the built environment be compared to all agricultural land in the county is misplaced.

17

01353

It would be illogical to determine whether the built environment predominates over open space, natural landscape and vegetation by considering and comparing the footprint of a development of any sort to all the agricultural land in a county. Under that analysis, a square mile of skyscrapers in the middle of one hundred square miles of farm fields would not qualify as predominating over the natural landscape. Yet it would clearly not be in keeping with rural character. This is obviously not the intent of the zoning codes, the Growth Management Act provisions, or twenty plus years of other land use decisions. In determining what the "built environment" factor means, this Court has found no case setting out firmly the parameters of this inquiry, either with regard to which land is to be used for comparison to the built environment, or to what percentage should be considered dispositive. We are left with a common sense analysis.

The plaintiff has not shown that the Commissioners engaged in an erroneous interpretation of the law surrounding rural character, under Factor 1)(b).

IV. **The Resolution is supported by substantial evidence in light of the entire record, pursuant to RCW 36.70C.130(1)(c).**

18

Plaintiff claims under the Standard for Granting Relief, RCW 36.70C.130(1)(c), that the resolution was not supported by evidence that is substantial when viewed in light of the whole record before the court. This is a sufficiency of evidence claim. Plaintiff has specifically objected in this capacity to **Finding 2,** *The proposed use in the proposed location is not essential or desirable to the public convenience, and is detrimental or injurious to the public health, peace, or safety, or to the character of the surrounding neighborhood*, and also to **Finding 3,** *The proposed use in the proposed location would not ensure compatibility with existing neighboring land uses.*

The legal standard on any claim of sufficiency of evidence for the commissioners' findings under this provision is for the reviewing court to consider all evidence and reasonable inferences "in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority." *Cingular Wireless, LLC v. Thurston County,* 131 Wn. App. 756 (2006)

Plaintiff contends again in this section that the fact-finder is the Hearing Examiner. In fact, however, as in previous issue discussions, the fact-finder entitled to the inference is the Board of County Commissioners. The Board's role in the conditional use permit process is to determine whether the applicant has met the requirements of the conditional use using

19

KCC 17.60A.015 Review criteria. The Hearing examiner did not have that authority to permit and authorize a conditional use. The Board in that instance does not exercise appellate jurisdiction but original jurisdiction.

Under the substantial evidence standard, there must be a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true. *Phoenix Development, Inc. v. City of Woodinville,* 171 Wn. 2d 820 (2011). In addition, the court reserves credibility determinations for the fact finder and does not review them on appeal. *J.L. Storedahl & Sons, Inc. v. Cowlitz County,* 125 Wn. App. 1 (2004).

It is worth noting that the following analysis has nothing whatever to do with the views of the Court itself as to the beneficial nature of solar projects in general or this project in particular. All parties need to remember that this Court, as a reviewing appellate court cannot substitute its own judgment for the judgment of the Kittitas County Commissioners. It was for the commissioners to determine whether the review criteria under KCC 17.60A.015 for a conditional use permit were met. It is possible for there to be substantial evidence on BOTH sides of any issue. It is for the finder of fact, in this case the BOCC, to weigh the evidence and decide the matter. The Court will uphold the decision under this prong if it is supported by

20

substantial evidence when viewed in light of the whole record.

It is also worth noting that more detailed and comprehensive findings from the commissioners would have assisted all parties and the court greatly in considering this appeal. However, having found that they are sufficiently specific to at least enable the court to consider the nature and amount of evidence that supports them, the court will discuss each one here.

*Regarding Finding 2:* In reviewing the evidence in the record, and taking that evidence in the light most favorable to the defendants, this Court finds there is substantial and sufficient evidence for the commissioners to find the proposed solar facility is not essential or desirable to the public convenience, and that it is detrimental or injurious to the character of the surrounding neighborhood.

There was no evidence this Court could find in the record that the facility was in fact essential to the public convenience. The plaintiff instead focused on desirability. There was much discussion of the beneficial nature of clean, renewable energy. Both the proponents of the site and most of the opponents of the site agreed in general with the beneficial nature of clean energy in the abstract. However there was no testimony to the need for placement of this project at this location, other than an assertion that the energy would be sold to PSE, which entity provides some, though not all, of the

21

electricity in the Kittitas Valley. Evidence of the project's desirability was countered by much discussion from opponents about the better suitability of land in other locations in the county for the purpose of a solar farm. Although there was testimony in the record as to potential property tax revenue and a projected amount of clean energy that could be added to the local power grid, the commissioners were not compelled to declare it desirable when weighed against the rest of the testimony in the record.

The solar project was described by proponents as the largest solar farm in the State of Washington. Opponents to the facility were concerned with the aesthetics of thousands of steel racks of panels, up to eight feet high, which are supported by steel pillars, driven 6 to 8 feet into the ground throughout 47.5 acres of prime growing land, as well as accompanied by boxes and instruments of electrical equipment. Local persons were concerned with the sixty acre parcels being surrounded by a huge chain link fence, eight feet high with strands of barbed wire at the top, and there were many comparisons with heavy industry or prisons. The impact on the view from the surrounding neighborhood at this flat mid-valley location is undeniable. The Commissioners were entitled to consider the aesthetics of such a facility. There was testimony from a local realtor about property values diminishing. The commissioners were entitled to believe this testimony over the assertions of the plaintiff that studies from

22

some eastern states show no change in property values around solar farms. Neighbors were concerned with potential issues with weeds in a sensitive timothy hay-growing area, and there was testimony about spraying. Taken in the light most favorable to the county, the Commissioners were entitled to consider this testimony about the difficulties with weed control and to weigh that over the plaintiff's testimony about weeds. There were assertions about glare, about noise, and about the impact to wildlife from neighbors who have seen wildlife on that particular property, which commissioners were entitled to believe despite the SEPA findings.

There were pages of letters, maps, and photographs discussing the local opposition to the siting of the solar facility. There was testimony from numerous nearby landowners as to the character of the surrounding area, and to the potential impact of this clearly non-agricultural, heavily industrial property use to the people of this particular area. It was undisputed that the character of the surrounding area is farmland. The site itself is prime farmland and has been farmed for years. Plaintiffs suggest without evidence that this is true of all A-20 property, and that the opposition was not site specific; this Court finds that the opposition to the project was completely site specific. The character of every parcel of A-20 land is not before the court. Only this set of parcels is before the Court, and this neighborhood. Considering all facts and

23

inferences in the light most favorable to the Commissioners, a fair minded person could make the finding that the proposed use in the proposed location is not desirable to the public convenience, and is detrimental to the character of the surrounding neighborhood. There was substantial evidence in the record as a whole to support the finding.

This holding is consistent with the holding in *Cingular Wireless, LLC v. Thurston County,* 131 Wn. App. 756 (2006), in which the Court found that the testimony of area residents amply demonstrated that a cell tower would adversely impact views of Mt. Rainier and open vistas of rural farmland. In noting that no other structures pierced the natural skyline in that area, the court held that the record contained sufficient evidence of incompatibility with neighborhood character and adverse aesthetic impacts to support the hearing examiner's decision in that case.

In this court's review, however, there is not substantial evidence sufficient to show that the project is detrimental or injurious to the public health, peace, or safety. The complaints about the facility involved the nature of the area and its effect on nearby farmers. Despite questions about the potential for broken panels to leach harmful chemicals into the soil, there was not sufficient evidence produced that this was a likely event. The court will strike that portion of Finding and Conclusion 2.

24

*Regarding Finding 3:* Some opposition to the project declared the site to have incompatibility with existing neighboring land uses. Plaintiffs argued in their submission to the County that the solar farm would have no impact on the ability of neighboring farmers to continue to farm. The testimony and discussion concerning special problems of weed control around timothy hay were most germane to this finding. There were also concerns expressed in the record regarding water control. Although the aesthetic issues relevant to Finding 2 do not impact the ability of neighbors to farm, the evidence, taken in the light most favorable to the Commissioners, is marginally sufficient for the Commissioners to make the finding and conclusion that the proposed use does not ensure compatibility with neighboring land uses.

The plaintiff's contention that *J.L. Storedahl &sons, Inc. v. Clark County* (143 Wn.app. 920 (2008) and *Lakeside Industries v. Thurston County* (119 Wn. App. 886 (2004) require the adoption of the Hearing Examiner's facts is incorrect. In both *Storedahl* and *Lakeside* the Board of Commissioners sat as an appellate body. In *Storedahl*, the Board did not follow legislatively established re-zone criteria for the review of the rezone. In *Lakeside* the Hearing Examiner had the authority to make the actual decision

25

and the Board heard the appeal.

Plaintiff has not shown insufficient evidence under Factor (1)(c).

## V. Resolution 2017-022 is not a clearly erroneous application of Kittitas County's conditional use permit criteria from KCC 17.60A.015, as listed in standard RCW 36.70C.130(1)(d).

Plaintiff contends that the discussion which the Commissioners indulged in regarding the general suitability of solar facilities in the A-20 zone showed that they erroneously relied upon the precedential effect of their decision. Plaintiff correctly points out that the comprehensive plan and ensuing development regulations should not be revisited during a project review.

A finding is clearly erroneous under subsection (d) when, although there is evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed. *Norway Hill Pres. & Prot. Association v. King County Council*, 87 Wn. 2d 267 (1976)

The commissioners did express reservations about siting such a facility in the A-20 designation. However, it is also clear from the oral record when Commissioner Jewell pointed it out, that they knew they could not make their decision on this case based on a rethinking of conditional uses in A-20 generally. The

26

Court is satisfied that the commissioners were analyzing this particular project at this particular site rather than changing the conditional use criteria when making the findings that they made. The Court is not left with a definite and firm conviction that plaintiff's alleged mistake was committed.

This determination is made despite the later moratorium placed on the future siting of solar PV facilities. It appears that the commissioners realized the question of suitability for large scale solar energy facilities to be placed in an A-20 zone is a matter that the commissioners must take up outside any particular project review.

**CONCLUSION**

For the above stated reasons, the Board of County Commissioner's decision to deny One Energy Development and Iron Horse Solar the conditional use permit in Resolution 2017-022 is upheld. The plaintiff has failed to establish that any of the six standards set forth in RCW 36.70C.130(1) have been met.

Dated this ___30th___ day of November, 2017.

_____
Judge Hooper

27

01363